1
2
3
4
5
6
7
8
9
10

**United States District Court**
For the Northern District of California

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

KENNETH LAKES,

        Plaintiff,

  v.

MICHAEL CHERTOFF,

        Defendant

_____/

No. C-05-4874 MMC
No. C-07-1792 MMC

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

    Before the Court is the Motion for Summary Judgment, filed February 12, 2008, on

behalf of defendant Michael Chertoff, sued in his official capacity as Secretary of Homeland

Security, Customs and Border Protection ("CBP").  Plaintiff Kenneth Lakes ("Lakes") has

filed opposition, to which the CBP has replied.  Having read and considered the papers

filed in support of and in opposition to the motion, the Court rules as follows.[1]

**BACKGROUND**

    Lakes, who is African-American, was formerly employed by the CBP, most recently

as a Supervisor, Canine Enforcement Officers, in San Francisco, California.  The above-

titled consolidated matter consists of two actions.

    In his complaint filed in Civil Case No. 05-4874 ("2005 Complaint"), Lakes alleges

that, while he was employed by the CBP, he was subjected to "retaliation for engaging in

_____

    [1]By order filed May 27, 2008, the Court took the matter under submission.

1  protected activity" and discrimination on the basis of "race" and "color" when the CBP did

2  not select him for certain open and/or temporary positions, (see 2005 Complaint ¶¶ 4, 20-

3  21, 23),[2] and in other ways subjected him to unequal treatment, (see id. ¶¶ 5, 22).

4      In his complaint filed in Civil Case No. 07-1792 ("2007 Complaint"), Lakes alleges he

5  was subjected to "retaliation for engaging in protected activity" and discrimination on the

6  basis of "age [and] color" when the CBP terminated his employment on September 26,

7  2006.  (See 2007 Complaint ¶¶ 4, 6.)[3]

8                               **LEGAL STANDARD**

9      Rule 56 of the Federal Rules of Civil Procedure provides that a court may grant

10  summary judgment "if the pleadings, the discovery and disclosure materials on file, and any

11  affidavits show that there is no genuine issue as to any material fact and that the movant is

12  entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(c).

13      The Supreme Court's 1986 "trilogy" of Celotex Corp. v. Catrett, 477 U.S. 317 (1986),

14  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and Matsushita Electric Industrial Co.

15  v. Zenith Radio Corp., 475 U.S. 574 (1986), requires that a party seeking summary

16  judgment show the absence of a genuine issue of material fact.  Once the moving party

17  has done so, the nonmoving party must "go beyond the pleadings and by [its] own

18  affidavits, or by the depositions, answers to interrogatories, and admissions on file,

19  designate specific facts showing that there is a genuine issue for trial."  See Celotex, 477

20  U.S. at 324 (internal quotation and citation omitted).  "When the moving party has carried

21  its burden under Rule 56(c), its opponent must do more than simply show that there is

22  some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  "If the

23  [opposing party's] evidence is merely colorable, or is not significantly probative, summary

24  

25        [2]In the 2005 Complaint, Lakes also alleges discrimination on the basis of age.  (See
id. ¶¶ 5, 6.)  During the course of discovery, however, Lakes withdrew that allegation.  (See

26  Pyle Decl. Ex. B at 3:16-18 (stating, in response to the CBP's First Set of Requests for
Admissions, "[p]laintiff does not allege discrimination based on age").)

27        [3]In both complaints, Lakes alleges the CBP was formerly known as the U.S.

28  Customs Service.  For purposes of this order, the Court will refer to Lakes' employer as the
CBP.

1  judgment may be granted." Liberty Lobby, 477 U.S. at 249-50 (citations omitted).

2  "[I]nferences to be drawn from the underlying facts," however, "must be viewed in the light

3  most favorable to the party opposing the motion." See Matsushita, 475 U.S. at 587

4  (internal quotation and citation omitted).

5                              **DISCUSSION**

6  **A.  2005 Complaint**

7          In his 2005 Complaint, Lakes alleges he was subjected to the following retaliatory

8  and/or discriminatory adverse employment acts:  (1) on thirteen occasions, he was not

9  selected for open positions, (see 2005 Complaint ¶¶ 4, 21); (2) on four other occasions,

10 Lake was not "temporarily promoted," (see id. ¶¶ 20, 23); and (3) on one occasion, Lakes

11 was not given an "overtime assignment," (see id. ¶ 22).  Additionally, although not

12 expressly alleged in the 2005 Complaint, both parties interpret the pleading as including a

13 claim that Lakes was subjected to a hostile work environment.  (See Def.'s Mot. at 19:4;

14 Pl.'s Opp. at 4:13-14.)

15         In the instant motion, the CBP argues Lakes lacks sufficient evidence to create a

16 triable issue of fact as to any of the claims alleged in the 2005 Complaint.[4]

17     **1.  Non-Selection Claims**

18         Lakes does not argue he can establish his claims by direct evidence of a retaliatory

19 or discriminatory motive.  Rather, Lakes relies on the burden-shifting approach set forth in

20 McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), whereby the plaintiff first

21 must establish a prima facie case.

22         To establish a prima facie retaliation claim, "a plaintiff must prove (1) [he] engaged in

23 a protected activity; (2) [he] suffered an adverse employment action; and (3) there was a

24 _____

25         [4]Alternatively, the CBP requests it be granted leave to amend its answer to allege
   the affirmative defense of res judicata, and that the Court consider such defense as part of
26 the instant motion.  The proposed defense is based on the theory that Lakes could have
   raised the claims alleged in his 2005 complaint in an action he filed against the CBP in
27 2004, Lakes v. Ridge, C-04-1915 TEH, which action was resolved in the CBP's favor when
   the district court granted the CBP's motion for summary judgment.  In light of the Court's
28 findings set forth herein, the Court does not consider the CBP's alternative argument.

1    causal connection between the two." See Surrell v. California Water Service Co., 518 F. 3d

2    1097, 1108 (9th Cir. 2008).

3          To establish a prima facie discrimination claim based on a failure to select for a

4    position, "a plaintiff must show that (1) [he] belongs to a protected class; (2) [he] applied for

5    and was qualified for the position [he] was denied; (3) [he] was rejected despite [his]

6    qualifications; and (4) the employer filled the position with an employee not of plaintiff's

7    class, or continued to consider other applicants whose qualifications were comparable to

8    plaintiff's after rejecting plaintiff." See Dominguez-Curry v. Nevada Transp. Dep't, 424 F.

9    3d 1027, 1037 (9th Cir. 2005).

10         If the plaintiff establishes a prima facie case, the defendant must proffer a legitimate

11   reason for its decision, and if the defendant does so, the plaintiff is required to show that

12   the defendant's proffered reason is pretextual.  See id.

13                    **a.  Open Positions**

14         In its moving papers, the CBP argues that Lakes lacks evidence to prove his failure

15   to be selected for any of the thirteen open positions was the product of retaliation and/or

16   discrimination.  In opposition, Lakes states he does not oppose the CBP's motion to the

17   extent the motion concerns the following ten open positions, each identified by its "Vacancy

18   Announcement" number:  (1) HQOFO/02-046 KRH; (2) SOLFLA/02-05 MTA; (3) MDAAC/

19   03-004 MTA; (4) SOATL/02-017 AC; (5) TUSCO/02-018 DLK; (6) SOATL/04-033;

20   (7) GULF/04-002; (8) WETEX/04-001 DL; (9) BLTN/01-001 JJF; and (10) SOPAC/02-009

21   KW.  (See Pl.'s Opp. at 2:19 - 3:7.)  Accordingly, the CBP's motion will be granted to the

22   extent it is based on Lakes' failure to be selected for any of those ten open positions.

23         The Court next considers the remaining three open positions for which Lakes was

24   not selected.

25                    **(1)  SOTEX/02-013**

26         The CBP offers the following evidence with respect to this open position.

27         Lakes applied for the position of "Supervisory Canine Enforcement Officer" in Pharr,

28

                                    4

1  Texas, pursuant to "Vacancy Announcement SOTEX/02–013." (See Dhillon Decl. ¶ 3.)[5]

2  William S. Heffelfinger ("Heffelfinger"), at that time Deputy Assistant Commissioner of the

3  Office of Field Operations, selected Robert Lopez ("Lopez") for the position, in reliance on a

4  recommendation he received from Gurdit S. Dhillon ("Dhillon"), who at the time was

5  Director of Field Operations for the Laredo Field Office.  (See id. ¶¶ 3, 4; Heffelfinger Decl.

6  ¶¶ 3, 6.)  Dhillon declares he recommended Lopez because Lopez "had an excellent

7  application," a "distinguished record as a supervisor, manager, and officer," and

8  "possesse[d] an extensive knowledge of [CBP] procedures, policies, and budget

9  administration," and was, in Dhillon's opinion, "the most qualified candidate." (See Dhillon

10  Decl. ¶ 4.)  Heffelfinger and Dhillon each declare that, at the time the subject decision was

11  made, he did not take Lakes' race or color into consideration and was "not aware" Lakes

12  had engaged in any prior Equal Employment Opportunity ("EEO") activity.  (See id.

13  ¶ 5; Heffelfinger Decl. ¶ 9.)

14       The CBP argues that, based on the above-referenced evidence, Lakes cannot

15  establish a prima facie case of retaliation or discrimination.  Alternatively, the CBP argues,

16  Lakes cannot establish the CBP's stated legitimate reason, specifically, Dhillon's opinion

17  that Lopez was the most qualified candidate, is pretextual in nature.

18                    **(a)  Retaliation**

19       As noted, to establish a prima facie retaliation claim, Lakes must show he engaged

20  in protected activity, suffered an adverse employment action, and that a causal connection

21  existed between the protected activity and the employment action.  See Surrell, 518 F. 3d

22  at 1108.

23       The first two of these elements are not in dispute.  In particular, it is undisputed that,

24  prior to applying for the subject promotion, Lakes engaged in protected activity by

25  submitting EEO complaints.  One such complaint was submitted on August 8, 1994, when

26  Lakes contacted the EEO office of the CBP's San Diego/Calexico office and submitted a

27  _____

28       [5]Neither party offers evidence as to the date on which Lakes applied for this open
     position, or on which he applied for any of the other open positions at issue herein.

1    claim alleging his then supervisor, Lee Sanders ("Sanders"), engaged in "discriminatory"

2    conduct and "retaliation as a result of [Lakes'] involvement in the EEO process," by reason

3    of Sanders' having advised Lakes that Lakes would be subject to "disciplinary action" for

4    not submitting a "medical release" to explain why Lakes had been absent from work on

5    August 5, 1994.  (See Ross Decl., filed March 31, 2008, Ex. 1, second page.)  Additionally,

6    the CBP does not argue Lakes was not qualified for the open position, and, consequently,

7    does not assert Lakes is unable to establish his non-selection for such position constituted

8    an adverse employment action.

9         With respect to the remaining element, Lakes argues that a causal connection exists

10   between his 1994 EEO complaint and Dhillon's decision, in 2003, to recommend Lopez for

11   the subject promotion.[6]  Specifically, Lakes argues, a triable issue of fact exists as to

12   whether Dhillon, in his declaration submitted in 2008 in support of the instant motion, lied

13   when he stated he was "not aware" of any prior EEO activity by Lakes.  (See Dhillon Decl.

14   ¶ 5.)  Lakes asserts that if the trier of fact determines Dhillon lied about his inability to recall

15   Lakes' prior EEO activity, the trier of fact could reasonably infer the requisite causal

16   connection between Dhillon's 2003 recommendation and Lakes' 1994 EEO complaint.[7]

17        In that regard, Lakes relies on a "Memorandum," dated August 15, 1994, written by

18   Elizabeth Banagan ("Banagan"), an "EEO Counselor," and addressed to Dhillon, in his

19   capacity as District Director of the San Diego/Calexico office.  (See Ross Decl. Ex. 1, first

20

21        [6]As noted, Heffelfinger's decision was based on Dhillon's recommendation.
     Consequently, Dhillon's state of mind is relevant.  See, e.g., Ostad v. Oregon Health
22   Sciences Univ., 327 F. 3d 876, 885 (9th Cir. 2003) (holding where supervisor with
     retaliatory animus recommended plaintiff's termination, decisionmaker's "lack of information
23   about [plaintiff's] protected conduct and [supervisor's] bad motives did not cut off the chain
     of causation").

24        [7]A causal link between the protected activity and the employment decision can be
     inferred from evidence the employer knows of the protected activity and there is a
25   "proximity in time between the protected activity and the allegedly retaliatory employment
     decision."  See Yartzoff v. Thomas, 809 F. 2d 1371, 1376 (9th Cir. 1987) (holding three
26   month period between protected activity and employment decision sufficient from which to
     infer causal link for purposes of prima facie case).  Here, given that the passage of time
27   between the protected activity and Dhillon's recommendation was approximately nine
     years, Lakes does not argue that a causal link can be inferred from the timing of the
28   relevant events.

page.)  The memorandum states that "informal counseling on a discrimination issue on the

basis of retaliation was initiated," and that "appropriate management officials and

employees [would] be contacted in an effort to conduct the counseling."  (See id.).

Although the memorandum itself does not identify the complainant or provide any

information concerning the nature of the complaint, (see id.), attached thereto is a one-

page form completed by Banagan, in which she identifies Lakes as the complainant and

summarizes in a paragraph an EEO complaint Lakes had submitted to her office on August

8, 1994.  (See id. Ex. 1, second page.)

Lakes offers no evidence, however, that Dhillon received the above-referenced

memorandum and attachment.  The only other evidence possibly bearing on the issue of

Dhillon's awareness of the complaint is included in Lakes' declaration.  First, Lakes states

Dhillon was "involved in [the 1994] EEO complaint."  (See Lakes Decl. ¶ 7.)[8]  Such

statement, however, is entirely conclusory in nature and, consequently, is insufficient to

create a triable issue of fact.  See Lujan v. National Wildlife Federation, 497 U.S. 871, 888

(1990) (holding party opposing summary judgment does not create "genuine issue for trial"

with "conclusory allegations [in] an affidavit").  Second, Lakes states that his "case," an

apparent reference to his 1994 EEO complaint, was "given coverage in the media" and that

Dhillon was "extremely unhappy about this."  (See Lakes Decl. ¶ 7.)  Lakes fails to state the

basis for his asserted knowledge that Dhillon was unhappy, let alone that Dhillon was

unhappy because of media coverage of Lakes' "case."  Moreover, Lakes fails to offer any

evidence with respect to the "coverage in the media," thereby leaving the trier of fact to

speculate as to the nature, extent, and type of "coverage" that occurred.  In short, Lakes

has not created a triable issue of fact as to whether Dhillon was aware of the 1994 EEO

complaint in either 1994 or 2003.

Even assuming a fact-finder could reasonably find Dhillon was made aware of

Lakes' 1994 EEO complaint in 1994, Lakes fails to offer any evidence from which a trier of

---

[8]The Lakes Declaration is Exhibit 3 to the Declaration of David L. Ross.

1   fact could reasonably conclude that Dhillon lied in his 2008 declaration, when he stated he

2   did not recall Lakes' having been involved in any prior EEO activity.  The 1994 complaint,

3   as described in the attachment to the memorandum, was characterized as one involving a

4   relatively minor and uncontroversial issue – whether a supervisor should have required an

5   employee to provide a medical excuse for missing a day of scheduled work.  Further,

6   Dhillon's 2008 statement was made more than thirteen years after Lakes, one of over 1500

7   employees who reported to Dhillon in 1994, submitted his 1994 EEO complaint.  Finally,

8   Lakes offers no evidence that he has had any contact, let alone negative contact, with

9   Dhillon between 1994 and 2003, or that Dhillon ever made any comment suggesting he

10  harbored any view, let alone a negative view, concerning Lakes.  Cf. Bergene v. Salt River

11  Project Agricultural Improvement & Power Dist., 272 F. 3d 1136, 1141-42 (9th Cir. 2001)

12  (holding plaintiff created triable of fact as to causal relationship between failure to promote

13  and prior discrimination claim against employer, where, inter alia, decisionmaker greeted

14  plaintiff with phrase, "Hi, trouble" before deciding to select another employee for position).[9]

15      Consequently, the Court finds plaintiff has failed to offer sufficient evidence to

16  establish a prima facie case of retaliation with respect to his failure to receive the position

17  identified in Vacancy Announcement SOTEX/02–013.

18      Accordingly, the CBP is entitled to summary judgment in its favor on this claim.

**(b)  Discrimination**

20      Lakes also alleges he did not receive the position because of discrimination on

21  account of his race and color.

22      At the outset, the CBP argues Lakes cannot establish a prima facie case of

23  discrimination.  The CBP does not dispute, however, that Lakes is a member of a

---

25      [9]Dhillon, upon being shown the 1994 memorandum in the course of the instant
26  action, submitted a second declaration indicating, consistent with his initial declaration, that
    he does not recall ever having received it, and stating that at the time the memorandum
27  was dated, Lakes was one of 1500 employees who reported through the chain of command
    to Dhillon, that Dhillon was in the process of leaving the San Diego office in light of his
28  having been transferred to El Paso, and that Dhillon was transferring his duties to others in
    his chain of command.  (See Rebuttal Dhillon Decl. ¶¶ 3-5.)

1   protected class and that he applied for and was not selected for the subject position.  Nor

2   does the CBP contend that Lakes was not qualified for the position or that Lopez, the

3   person selected, is a member of the same protected class.  See Dominguez-Curry, 424 F.

4   3d at 1037 (setting forth prima facie elements for failure to promote claim).

5         The CBP alternatively argues that Lakes cannot establish that the CBP's articulated

6   non-discriminatory reason for selecting Lopez, specifically, that Lopez was the most

7   qualified, is a pretext for unlawful discrimination on the basis of race or color.  In his

8   opposition, Lakes sets forth his theory.  Specifically, Lakes argues, Dhillon "lied," in his

9   2008 declaration, when Dhillon stated he did not recall that Lakes had made any EEO

10  complaints, and, consequently, a trier of fact could reasonably infer that Dhillon further lied

11  when he stated he believed, in 2003, Lopez was the most qualified applicant.  Lakes,

12  however, offers no evidence to support a finding that Lakes' qualifications were superior to,

13  or even equivalent to, those of Lopez.  In any event, for the reasons stated above, the

14  Court finds Lakes has failed to offer sufficient evidence to create a triable issue of fact as to

15  Dhillon's having lied when he stated that he did not recall that Lakes had been involved in

16  any prior EEO activity.

17        Consequently, the Court finds plaintiff has failed to offer sufficient evidence to

18  establish a claim of discrimination with respect to his failure to receive the position identified

19  in Vacancy Announcement SOTEX/02–013.

20        Accordingly, the CBP is entitled to summary judgment in its favor on this claim.

21                          **(2)  MDPAC/04-005 RTT**

22        The CBP offers the following evidence with respect to this open position.

23        Lakes applied for the position of "Supervisory Inspector" in San Francisco, pursuant

24  to "Vacancy Announcement MDPAC/04-005RTT."  (See Aycox Decl. ¶ 3; Heffelfinger Decl.

25  ¶ 3.)  Heffelfinger, then Deputy Assistant Commissioner of the Office of Field Operations,

26  selected Evan Bladh, Susan Fiust, Sharon Richards, and Patrick Burke for the openings

27  identified in the subject announcement, acting in reliance on a recommendation he

28  received from Nat H. Aycox ("Aycox"), then Director of Field Operations for the San

9

1   Francisco Office.  (See Aycox Decl. ¶¶ 3, 4; Heffelfinger Decl. ¶¶ 4-6.)  Heffelfinger

2   declares that, at the time the decision was made, he did not take Lakes' race or color into

3   consideration and that he was "not aware" Lakes had engaged in any prior EEO activity.

4   (See Heffelfinger Decl. ¶ 9.).  Aycox declares he selected the above-identified individuals

5   because each was "rated as exceptional in performance and managerial capacities by [his

6   or her] supervisors" and had "worked successfully in the inspectional job series, where the

7   announced position also lies."  (See Aycox Decl. ¶ 5.)  Aycox also declares that Lakes'

8   experience "as a canine supervisor did not have the same value as the experience of the

9   selectees, since most of his experience was in another job series" and that Lakes "had no

10  areas where his expertise and experience equaled the [selected] four individuals, with the

11  exception of knowledge and experience in the canine program, which was not a highly

12  important factor in the advertised position."  (See id.)  Aycox further declares he was

13  aware, at the time he made the recommendations to Heffelfinger, that Lakes had filed

14  seven prior EEO complaints, that Lakes had "attempted to file" another, and that Lakes is

15  African-American.  (See id. ¶ 6.)  Aycox states, however, that Lakes' race, color, and prior

16  EEO activity were not factors in his decision.  (See id.)

17        The CBP argues that, based on the above-referenced evidence, Lakes cannot

18  establish a prima facie case of retaliation or discrimination.  Alternatively, the CBP argues,

19  Lakes cannot establish the CBP's stated legitimate reason, specifically, that the four

20  selected individuals had qualifications superior to those of Lakes, is pretextual in nature.

                              **(a)  Retaliation**

22        It is undisputed that Lakes, prior to his applying for this position, engaged in

23  protected activity.  Further, the EEO does not argue that Lakes was unqualified for the

24  subject position or that Lakes cannot establish his non-selection was an adverse

25  employment action.

26        With respect to the remaining element necessary to establish a prima facie case of

27  retaliation, specifically, that a causal connection exists between Lakes' EEO activity and his

28  failure to receive one of the positions, Lakes relies on his declaration, in which he states

                                    10

1    "Aycox was the subject of many of [Lakes'] EEO complaints and had to appear numerous

2    times to answer EEO investigator questions." (See Lakes Decl. ¶ 8.)  Assuming such

3    testimony would be sufficient to support a prima facie case of retaliation, Lakes fails to offer

4    any evidence to support a finding that Aycox's stated reason for recommending others,

5    specifically, that each of the persons selected was more qualified than Lakes, was a pretext

6    for unlawful retaliation.  For example, Lakes does not contend he had been rated as

7    "exceptional in performance and managerial capacities" by his supervisor, as was the case

8    with each of the four selected persons, (see Aycox Decl. ¶ 5), nor that he had experience

9    superior to, or even equivalent to, those of any of the four selected persons.  Indeed, Lakes

10   fails to offer any evidence comparing himself to the selected persons on any basis, let

11   alone comparing himself to the selected persons on the basis of the criteria employed by

12   the CBP.  See, e.g., Coleman v. Quaker Oats Co., 232 F. 3d 1271, 1285, 1288 (9th Cir.

13   2000) (holding, where employer's stated legitimate reason for selecting another for open

14   position is that selected person is more qualified, "[t]he question is whether [the plaintiff] is

15   more qualified with respect to the criteria that [the employer] actually employs"; finding

16   plaintiff failed to raise triable issue of fact as to pretext, where plaintiff offered "no evidence

17   that his analytical abilities [were] superior to those of the employees [the employer]

18   selected, the very skills [the employer articulated] as the rationale for its employment

19   decisions").

20          Accordingly, the CBP is entitled to summary judgment in its favor on this claim.

21                          **(b)  Discrimination**

22          As noted, the CBP does not argue that Lakes was unqualified for the subject

23   position.  Further, the CBP does not argue that any selected person was African-American.

24   Consequently, the Court finds Lakes has established a prima facie case of discrimination.

25   The Court thus considers whether a trier of fact could reasonably find Aycox's stated non-

26   discriminatory reasons for his recommendations were a pretext for unlawful discrimination.

27   In that regard, Lakes relies on his declaration, in which he states that Richard Vigna

28   ("Vigna"), who at a time unspecified by Lakes worked as a "deputy" to Aycox, was "prone to

11

1  using the 'N' word when describing African-Americans." (See Lakes Decl. ¶ 8.)  Lakes also

2  relies on deposition testimony offered in another action by Nina Grass ("Grass"), who

3  stated she heard Vigna once use the word "nigger."  (See Ross Decl. Ex. 9 at 12:24 - 13:6.)

4  Because Lakes does not state he ever heard Vigna use the "'N' word," or otherwise explain

5  the basis for his conclusory assertion that Vigna was "prone" to using the "N" word, it would

6  appear such basis is the testimony offered by Grass, which, as noted, is that she heard

7  Vigna use the term on a single, unspecified occasion.  In any event, Lakes offers no

8  evidence that Vigna played any role in recommending or selecting persons for the subject

9  positions, let alone that Aycox was aware of the incident referenced by Grass in her

10  deposition testimony.

11      Consequently, the Court finds plaintiff has failed to offer sufficient evidence to

12  establish a claim of discrimination with respect to his failure to receive one of the positions

13  identified in Vacancy Announcement MDPAC/04–005.

14      Accordingly, the CBP is entitled to summary judgment in its favor on this claim.

15              **(3)  MDPAC/03-006 MTA**

16      The CBP offers the following evidence with respect to this open position.

17      Lakes applied for the position of "Border Security Coordinator" in San Francisco,

18  pursuant to "Vacancy Announcement MDPAC/03–006." (See Aycox Decl. ¶ 4; Ahern Decl.

19  ¶ 3.)  Jayson P. Ahern ("Ahern"), then Assistant Commissioner, Office of Field Operations,

20  selected Vigna for the position, in reliance on a recommendation Ahern had received.  (See

21  Ahern Decl. ¶  4.)  Ahern declares that, at the time he made the selection, he was unaware

22  of Lakes' race or color and was unaware Lakes had engaged in any prior EEO activity.

23  (See id. ¶ 8.)  The recommending officer was Aycox, who recommended Vigna because

24  Vigna was, in Aycox's opinion, the "most qualified person."  (See Aycox Decl.

25  ¶ 4.)  According to Aycox, Vigna had "the most wide ranging knowledge of enforcement

26  operations required by the position," had "shown expertise in all of the areas required by

27  the position, including oral and written communication, staff work and the ability to lead

28  working groups," and was "highly recommended by the San Francisco Port Director."  (See

12

1    <u>id.</u>) Aycox further states, as noted above, that he was aware, at the time he made the

2    recommendation, that Lakes had filed seven prior EEO complaints, that Lakes had

3    attempted to file another, and that Lakes is African-American; Aycox again states that

4    Lakes' race, color, and prior EEO complaints were not factors in his decision.  (<u>See</u> <u>id.</u> ¶ 6.)

5          The CBP argues that, based on the above-referenced evidence, Lakes cannot

6    establish a prima facie case of retaliation or discrimination.  Alternatively, the CBP argues,

7    Lakes cannot establish the CBP's stated legitimate reason, specifically, Vigna's being the

8    "most qualified person," is pretextual in nature.

9                               **(a)  Retaliation**

10          For purposes of the instant motion, the Court assumes Lakes has established a

11    prima facie case of retaliation.  Lakes fails, however, to offer any evidence to support a

12    finding that Aycox's stated reasons for recommending Vigna were a pretext for unlawful

13    retaliation.  Lakes offers no evidence, for example, to support a finding that his

14    qualifications were equivalent to those of Vigna.

15          Accordingly, the CBP is entitled to summary judgment in its favor on this claim.

16                            **(b)  Discrimination**

17          For purposes of the instant motion, the Court assumes Lakes has established a

18    prima facie case of discrimination.  Lakes fails, however, to offer evidence to support a

19    finding that Aycox's stated reasons for recommending Vigna were a pretext for unlawful

20    discrimination.  Although, as noted above, Lakes asserts, in conclusory fashion, that Vigna

21    was "prone to using the 'N' word when describing African-Americans," (<u>see</u> Lakes Decl.

22    ¶ 8), Lakes provides no foundation for such conclusion, and, of particular importance,

23    offers no evidence that either Aycox or Ahern was aware of any such comment(s) by

24    Vigna.

25          Accordingly, the CBP is entitled to summary judgment in its favor on this claim.

26                  **b.  Temporary Promotions**

27          In its moving papers, the CBP argues Lakes lacks evidence to prove that his failure

28    to be temporarily promoted on four occasions was the product of retaliation and/or

1   discrimination.  In opposition, Lakes argues he can establish a claim of "discriminatory and

2   retaliatory animus" with respect to "the temporary position."  (See Pl.'s Opp. at 4:11-12.)

3   Lakes, however, does not identify which of the four "temporary positions" he is continuing to

4   pursue.  In any event, as discussed below, the CBP has offered a legitimate, non-retaliatory

5   and non-discriminatory reason for selecting someone other than Lakes for each of the

6   temporary promotions, and Lakes offers no evidence to support a finding that such

7   reasons, or any of them, are pretextual in nature.

8       With respect to a Border Security Coordinator temporary promotion given to Geri

9   Desha ("Desha"),[10] the CBP offers evidence that Aycox selected Desha based on a

10  recommendation from Leo Morris ("Morris"), then Assistant Director of Field Operations in

11  the San Francisco Field Office, (see Aycox Decl. ¶ 7), and that Morris' recommendation

12  was based on his determination that Desha possessed "excellent writing and speaking

13  skills and a working knowledge of [the CBP's] automated targeting systems," (see Morris

14  Decl. ¶ 4).[11]  In his opposition, Lakes fails to make any specific reference to this temporary

15  position, let alone offer any evidence from which a trier of fact could find Morris' stated

16  reasons for his recommendation and/or Aycox's stated reliance thereon were pretextual in

17  nature.

18      With respect to three "Supervisory Customs Inspector" positions that were

19  temporary filled in May 2004, the CBP offers evidence that Aycox selected three other

20  supervisors, instead of Lakes, because each selected person had "a great deal more

21  experience and were more current in inspectional issues."  (See Aycox Decl. ¶¶ 7, 9.)

22  Lakes' opposition contains no discussion of these temporary positions, let alone any

23  evidence from which a trier of fact could find Aycox's stated reasons for selecting persons

24  other than Lakes were pretextual in nature.

25

26      [10]Desha was given the temporary promotion before August 2003,(see Morris Decl.
    ¶¶ 3-4); neither party offers any evidence as to the precise date of such temporary
27  promotion.

28      [11]Ultimately, this position was announced publicly in Vacancy Announcement
    MDPAC/03-006, and, as discussed above, Vigna was selected.  (See id.)

14

1    Accordingly, the CBP is entitled to summary judgment on these claims.

2        **2.  Failure to Receive Overtime**

3        In his complaint, Lakes alleges he was not provided the opportunity to work overtime

4    on April 4, 2004, because of retaliation and/or discrimination.  (See 2005 Compl. ¶ 21.)

5        In its moving papers, the CBP argues that Lakes lacks evidence to prove his failure

6    to be selected for the overtime assignment was the product of retaliation and/or

7    discrimination.  In particular, the CBP relies on the declaration of Vigna, who states the

8    person preparing the schedule for April 4, 2004 asked him whether to assign Lakes to a

9    shift, and he told the scheduler to select someone else.  (See Vigna Decl. ¶ 4.)  Vigna

10   further states that the employee working that shift would be required to complete a

11   "Management Data Enforcement System" report and to send it to the CBP headquarters,

12   and that Lakes, when he worked that shift one week earlier, had been unable to complete

13   and send the requisite report, and, further, had failed to report his inability to complete such

14   report to his supervisor.  (See id.)  Vigna also states that he had no input in the ultimate

15   selection for the subject shift, other than to direct the assigning officer to assign someone

16   other than Lakes.  (See id.)  Lastly, Vigna states that, at the time in question, he was aware

17   of "Lakes' general involvement in the EEO process," as well as Lakes' race, but that he did

18   not take these factors into account when making the above-referenced directive to the

19   scheduling officer.  (See id. ¶ 6.)

20       **a.  Retaliation**

21       For purposes of the instant motion, the Court assumes Lakes has established a

22   prima facie case of retaliation.  Lakes fails to offer, however, any evidence to support a

23   finding that Vigna's stated reasons, for directing the assigning officer to select someone

24   other than Lakes for the shift in question, was a pretext for unlawful retaliation.  Lakes

25   offers no evidence, for example, to support a finding that one week earlier, when he was

26   assigned to the particular shift in question, he had in fact performed the required tasks or, if

27   he had not, that he had reported his inability to perform those tasks to his supervisor.

28       Accordingly, the CBP is entitled to summary judgment in its favor on this claim.

**(b)  Discrimination**

Assuming Lakes has established a prima facie case of discrimination, Lakes fails to offer evidence to support a finding that Vigna's stated reasons, for directing the assigning officer to select someone other than Lakes for the shift in question, are pretextual in nature. For example, as noted above, Lakes offers no evidence to support a finding that during his assignment to the shift in question one week earlier, he had performed the required tasks or, if he had not, that he had reported such inability to his supervisor.

Lakes argues an inference of pretext nonetheless can be drawn from Lakes' declaration, in which, as noted, Lakes states that Vigna was "prone to using the 'N' word when describing African-Americans."  (See Lakes Decl. ¶ 8.)  As discussed above, Lakes' assertion is conclusory in nature and appears to be based exclusively on deposition testimony offered in another action by CBP employee Grass, who stated she had heard Vigna use the word on one occasion.  (See Ross Decl. Ex. 9 at 12:24 - 13:6).  Grass, however, was not asked, and, consequently, did not testify, as to the circumstances under which she heard Vigna use the word, or even to whom, if anyone, it may have been directed.  While the use of the word, if made, was unquestionably inappropriate, the use of the "N word" on one occasion at an unidentified time and under undisclosed circumstances does not constitute sufficient evidence from which a trier of fact could infer that Vigna's request that Lakes not be assigned to the subject overtime shift was because of racial animus.  See Merrick v. Farmers Ins. Group, 892 F. 2d 1434, 1438-39 (9th Cir. 1990) (holding "stray remarks," particularly when "unrelated to the decisional process, are insufficient to demonstrate that the employer relied on illegitimate criteria, even when such statements are made by the decisionmaker").

Accordingly, the CBP is entitled to summary judgment in its favor on this claim.

**3.  Hostile Work Environment Claim**

In its moving papers, the CBP argues that Lakes lacks evidence to prove he was subjected to a hostile work environment on account of his having engaged in protected activity and/or on account of his race or color.

16

"When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (internal quotations and citations omitted). Whether an environment is "sufficiently hostile or abusive" is determined by "looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." See Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998) (internal quotation and citation omitted).

In his opposition, Lakes argues that "[t]he record evidences an ongoing history of tormenting [Lakes]." (See Pl.'s Opp. at 8:17.)  The only evidence cited in support of this assertion is an affidavit, dated January 14, 1997, signed by James Beichler ("Beichler"), who was employed as a "Senior Inspector" by the CBP and was also a "Chief Steward" for the union.  (See Ross Decl. Ex. 6.)  In his 1997 affidavit, Beichler states that Lakes was then on a "45-day suspension" and that Lakes had been "given a leave restriction letter due to misconduct (excess leave taken)."  (See id.)  Although Beichler states that "management [had] treated Lakes differently," (see id.), Beichler provides no facts to support such a conclusion, e.g., that other employees engaging in the same or similar conduct were treated less harshly; consequently, his affidavit is insufficient to create a triable issue of fact.  Moreover, because Lakes and the CBP earlier settled any claim based on conduct occurring in or before September 29, 1997, (see Pyle Decl. Ex. F), the two incidents described by Beichler cannot form the basis for a finding of liability in the instant action.[12]

---

[12]The 2005 Complaint includes other factual allegations that, arguably, could pertain to a hostile work environment claim, specifically, that Lakes' "supervisor" in San Francisco "would not provide [Lakes] with such basic needs as an office, desk, computer, or workstation for the longest time," and that Lakes was "mostly not invited" to meetings concerning "intelligence matters, terrorist threats and possible responses thereto" and was "belittled" when he did attend such meetings.  (See 2005 Compl. ¶ 5.)  In his opposition,

1    Accordingly, the CBP is entitled to summary judgment on this claim.

2    **B.  2007 Complaint**

3    In his 2007 Complaint, Lakes alleges he was terminated on September 22, 2006,

4    and that the termination was retaliatory and discriminatory.

5    On June 7, 2006, Martin Childs, a Member of the Discipline Review Board, proposed

6    that Lakes be terminated for the following reasons:  (1) Lakes, on multiple occasions, had

7    instructed subordinates to put false information into official reports, specifically, to state

8    canines had discovered contraband that had, in fact, been discovered by means other than

9    by canines; (2) Lakes falsely told the CBP, on two occasions, that he had not instructed

10   subordinates to put the above-referenced information in official reports; and (3) Lakes, on

11   two occasions, engaged in conduct "unbecoming a supervisor"; specifically (a), in June

12   2003, in response to a statement by Ronald Knittel ("Knittel"), a subordinate, specifically,

13   that Knittel's stomach was bothering him, Lakes unzipped his pants, pulled them down to

14   hip level, and told Lorenzo Guerrero ("Guerrero"), another subordinate, to "hold [Knittel]

15   down" because Lakes "had something for [ ] Knittel's stomach," and (b) in October or

16   November 2003, Lakes, in a break room, pulled on his belt with both hands and told Knittel

17   that Lakes wanted to show him something.  (See 2007 Compl., second unnumbered exhibit

18   attached thereto.)

19   In a written decision effective September 22, 2006, Aycox, the Director of Field

20   Operations for the San Francisco office, terminated Lakes' employment.  (See 2007

21   Compl., first unnumbered exhibit attached thereto.)  In the decision, Aycox stated that,

22   after considering the evidence and a written response submitted by Lakes, through

23

24   however, Lakes does not cite to any evidence with respect to these allegations.
         The 2005 Complaint also alleges that after a "supervisor" threw rocks at Lakes in

25   1992, "managers attempted to stop the investigator from reporting the violation to upper
     management," and that Lakes was then sent on a "dangerous mission without the requisite

26   body protective vest."  (See 2005 Compl. ¶ 13.)  Again, Lakes fails to offer any evidence
     with respect to such allegations; rather, he refers to them only as "background," (see Pl.'s

27   Opp. at 8:7-14), apparently indicating he does not seek to hold the CBP liable for such acts
     in the instant action.  In any event, Lakes, in 1997, settled any claim he may have had

28   based on those events.  (See Pyle Decl. Ex. F.)

1    counsel, Aycox "[found] that the charges and specifications [were] fully supported by

2    preponderant evidence and [ ] concluded that [Lakes] committed the misconduct as

3    charged." (See id.)  With respect to the issue of whether Lakes had instructed

4    subordinates to include false information in reports, Aycox relied on affidavits provided by

5    six individuals, which Aycox found "consistent" and "corroborated by written documentation

6    and computer records." (See id.)

7         Thereafter, Lakes filed an administrative appeal, which was heard by the Merit

8    Systems Protection Board ("MSPB"). (See Pyle Decl. Ex. M at 1.)  After conducting a two-

9    day hearing, the MSPB affirmed the CBP's decision to terminate Lake's employment. (See

10   id.)[13]

11        **A. Retaliation**

12        As discussed above, to establish a prima facie case of retaliation, Lakes must show

13   he engaged in protected activity, suffered an adverse employment action, and that a causal

14   connection existed between the protected activity and the employment action.  See Surrell,

15   518 F. 3d at 1108.

16        Assuming Lakes has established a prima facie case based on Aycox's conceded

17   knowledge of Lakes' prior EEO activity, (see Aycox Decl. ¶ 6), the CBP has articulated

18   legitimate, non-retaliatory reasons for the termination.  In particular, the CBP determined

19   that Lakes instructed subordinates to falsely state, in official reports, that canines had

20   discovered contraband when, in fact, the canines had not discovered the contraband, and

21   later, when subordinates reported Lakes' directives, he denied to the investigators that he

22   had given them.

23        In opposition, Lakes, relying on his declaration, argues a triable issue of fact exists

24   as to Aycox's having a retaliatory motive to terminate Lakes.

25

26        [13]Where, as here, a federal employee unsuccessfully challenges a termination
     before the MSPB and thereafter files a civil action alleging discrimination, the employee is
27   entitled to a "trial de novo on [the] discrimination claim."  See Washington v. Garrett, 10 F.
     3d 1421, 1428 (9th Cir. 1993).  Accordingly, the Court does not review the sufficiency of the
28   findings made by the MSPB, but, rather, determines whether Lakes has submitted
     sufficient evidence herein to create a triable issue of fact as to discrimination.

First, Lakes, in his declaration, states that "[t]he reasons for [his] termination are factually untrue." (See Lakes Decl. ¶ 9.)  Lakes does not deny, however, that he instructed subordinates to place in CBP files notations indicating that a canine had discovered contraband when, in fact, a canine had not discovered contraband.[14]  As discussed above, conclusory statements, such as Lakes' assertion that the reasons proffered by CBP are "factually untrue," are insufficient to create a triable issue of fact.  See Lujan, 497 U.S. at 888.

Second, Lakes, in his declaration, takes issue with the motivations of some of the witnesses who submitted affidavits to Aycox concerning the canine reporting issue. Specifically, he declares that Knittel and Guerrero had, on unspecified dates, been "disciplined" by Lakes.  (See Lakes Decl. ¶ 9.F.)  Lakes fails to offer any authority, however, to support his implicit argument that management has a duty to reject statements against a supervisor offered by subordinates who have had previous disputes with that supervisor.  In any event, as noted, four other witnesses offered affidavits stating Lakes had directed the filing of reports with false information regarding canine discovery of contraband.[15]

Third, Lakes, in his declaration, states he is unaware of any "non-African-American supervisory employee" who was "terminated based on fabricated facts known to the deciding officer to be untrue." (See id. ¶ 9.)  As discussed above, however, Lakes has

_____

[14]Lakes does "specifically" deny lowering his pants and making unseemly comments to Knittel.  (See Lakes Decl. ¶ 10.)  Even assuming, arguendo, the CBP erred in accepting the contrary statements of Knittel and the other witnesses to the events allegedly involving Lakes' pants, the CBP's other stated reasons are sufficient to constitute a legitimate, non-retaliatory basis for the termination.

[15]Lakes also argues that the statements of two other witnesses should not have been accepted.  These arguments are based on assertions unsupported by any evidence, and, consequently, are without merit.  First, as to Shirley Tam ("Tam"), Lakes states that she "admitted she never saw the seizure in question," (see Lakes Decl. ¶ 9.D.); Lakes fails to explain the basis for his assertion, and the testimony by Tam offered by Lakes, (see Ross Decl. Ex. 8) includes no such statement by Tam.  Second, as to Zack Bennett ("Bennett"), a deaf person, Lakes states Bennett "claimed" to have "heard" a conversation between Lakes and Knittel by "body language," (see Lakes Decl. ¶ 9.E.); again, Lakes fails to explain the basis for his assertion, and the testimony by Bennett offered by Lakes, (see Ross Decl. Ex. 9), includes no such statement by Bennett.

failed to offer any facts to support his conclusory assertion that the charges against him were fabricated, let alone that Aycox knew the charges to have been untrue.  Further, to the extent Lakes, by offering such statement, may be arguing he was treated more harshly than similarly-situated employees, Lakes' argument is unpersuasive because Lakes fails to identify any other employee who engaged in conduct similar to that of Lakes, and who received a lesser punishment than termination.

Accordingly, the CBP is entitled to summary judgment in its favor as to this claim.

**B. Discrimination**

As discussed above, the CBP has articulated legitimate reasons for terminating Lakes' employment,[16] specifically, that Lakes directed subordinates to place false information into reports, and Lakes has failed to offer sufficient evidence to support a finding that the evidence upon which such determination was based was fabricated. Further, Lakes has failed to offer any evidence from which a trier of fact could otherwise conclude that Aycox's actual motive was to terminate Lakes because of Lakes' race or color.

Accordingly, the CBP is entitled to summary judgment in its favor as to this claim.

**CONCLUSION**

For the reasons stated above, the CBP's motion for summary judgment is hereby GRANTED.

**IT IS SO ORDERED.**

Dated: July 1, 2008

_____
MAXINE M. CHESNEY
United States District Judge

---

[16]Neither party addresses the issue of whether Lakes has established a prima facie case of discrimination based on the termination.  Accordingly, the Court assumes, for purposes of the instant motion, that Lakes has established a prima facie case.  The Court notes, however, that Lakes fails to offer any evidence to show that he was replaced by someone who is not African-American, or, as noted above, that he was treated more harshly than similarly situated employees who engaged in similar conduct.

21